IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 3, 2025

**IN RE DAWSON S., ET AL.**

**Appeal from the Chancery Court for Fentress County**
No. 23-03     Elizabeth C. Asbury, Chancellor

**No. M2024-01174-COA-R3-PT**

This appeal concerns the termination of a father's parental rights. Richmond S. and Lisa S. ("Petitioners") filed a petition in the Chancery Court for Fentress County ("the Trial Court") seeking to terminate the parental rights of Cory S. ("Father") to his minor children Dawson S. and Bentley S. ("the Children," collectively).[1] The Children were removed from Father's custody following an incident in which Bentley was severely injured. After a hearing, the Trial Court entered an order terminating Father's parental rights on five grounds, including severe child abuse. Father appeals, arguing among other things that he did not intentionally or knowingly harm Bentley. We vacate the Trial Court's waiver of a home study of Bentley in Petitioners' home because Tenn. Code Ann. § 36-1-116 requires that such a study be conducted when the child, like Bentley, is unrelated to the prospective adoptive parents.[2] Otherwise, we find that each of the grounds for termination found by the Trial Court were proven by clear and convincing evidence. We find further, also by clear and convincing evidence, that termination of Father's parental rights is in the Children's best interest. We remand to the Trial Court for a home study to be conducted in compliance with Tenn. Code Ann. § 36-1-116.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed, in Part, and Vacated, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

---

[1] In parental rights termination cases, this Court refrains from using the full names of children and their relatives.

[2] Petitioners are the maternal step-grandfather and maternal grandmother of Dawson.

Emily E. Wright, Livingston, Tennessee, for the appellant, Cory S.[3]

Laurie A. Seber, Cookeville, Tennessee, for the appellees, Richmond S. and Lisa S.

## OPINION

## Background

Dawson was born in January 2017, and Bentley in April 2020. Dawson was born to the marriage of Father and Haley S.[4] Father and Haley S. later divorced, and Father became the primary residential parent of Dawson. Father then married Tara M., and Bentley was born.[5] Father and Tara M. later divorced. Father and Tara M. had another child, Parker, who is not subject to this appeal. Meanwhile, Lisa S. is Haley S.'s mother, and Richmond S. is Haley S.'s stepfather. Thus, Lisa S. is Dawson's maternal grandmother, and Richmond S. is his maternal step-grandfather. Petitioners have no biological relation to Bentley, although they are foster parents to both he and his half-brother Dawson.

This case has its origins in a June 13, 2020 incident in which Bentley, then about ten weeks old, was severely injured. On that day, Tara M. left Bentley with Father so she could go to work. At around 11:00 a.m., Father called her in a frantic state. She went home to find an ambulance present. Bentley was limp and unresponsive. Bentley was airlifted to Vanderbilt Children's Hospital. Father and Tara M. drove to the hospital together. There, Bentley was diagnosed with a host of injuries: traumatic brain injury, subdural hemorrhage; retinal hemorrhage of right eye; subarachnoid hemorrhage; fracture of rib of right side; fracture of right tibia; femur fracture; and fracture of left tibia. The medical personnel at Vanderbilt assessed the trauma to be non-accidental. Father denies having intentionally or knowingly harmed Bentley. Nevertheless, on June 16, 2020, the Tennessee Department of Children's Services ("DCS") filed a petition to declare the Children dependent and neglected, and seeking emergency temporary legal custody. The Children were removed from Father's custody and placed in Petitioners' home.

In November 2020, Father was charged with aggravated child abuse and neglect, a class A felony, in connection with Bentley's injuries. Concurrently, dependency and neglect proceedings unfolded in juvenile court. The juvenile court found that Father perpetrated severe child abuse upon Bentley. Father appealed the juvenile court's ruling

---

[3] The Children's respective mothers elected not to file briefs.

[4] Haley S. has also gone by Haley A.

[5] Tara M. has also gone by Tara S.

to the circuit court. That appeal remains outstanding. In April 2023, Father pled guilty to attempted aggravated child abuse, a class B felony. He received an eight-year sentence with one year to serve. Father served 110 days of incarceration and was released. He remained on probation. When he was not incarcerated, Father visited regularly with the Children. Visitation was at Petitioners' discretion.

On January 5, 2023, Petitioners filed a petition in the Trial Court seeking to terminate Father's parental rights and to adopt the Children. Trial took place over the course of two days in March 2024. Among the evidence presented at trial was the deposition of Carrie Donnell ("Donnell"), a nurse practitioner at Vanderbilt who testified as an expert regarding Bentley's injuries. Donnell concluded that Bentley's injuries were non-accidental in nature.

First to testify was Tara M., Bentley's mother. Tara M. testified that on June 13, 2020, Father was keeping Bentley while she was working. Father later called her saying "Bentley, ambulance." Tara M. went home to find an ambulance and paramedics tending to Bentley. She described Bentley as "very limp," with his eyes stuck looking left. She described Father as "frantic." Bentley was taken to Vanderbilt by helicopter. Father and Tara M. drove there. Tara M. spoke with DCS early in the morning. Tara M. said she did not know how or why Bentley was hurt. The doctors explained that there was no way the injuries could be accidental because the force was "too much." Father told Tara M. that Bentley "rolled off the couch." Tara M. said that she initially believed Father's explanation. She later came to believe that he was not telling the truth. However, she continued to live with Father and had another child with him. The two remained together until they were served with the petition to terminate parental rights.

Tara M. acknowledged having previously testified in a deposition that Bentley's injuries were possibly accidental. Asked her current views, Tara M. said: "Someone hurt my child. I don't know who. I don't know how. I don't know why. But I don't think that I'm being told the truth about how it happened." Tara M. told Vanderbilt doctors that Bentley might have had shaken baby syndrome because Father shook him while running with him in his arms after the incident. Asked whether she ever talked to Father about how Bentley received broken ribs, she said "[s]ometimes." She said he did not know, and neither did she. Tara M. said that Bentley had been left with as many as ten or eleven people prior to the incident. Tara M. testified that she did not disagree with the juvenile court's finding that Bentley was intentionally injured while in Father's care. Despite the juvenile court's finding that Father pulled a gun on Tara M. on multiple occasions, including when she was pregnant, Tara M. denied this occurred. She said that, instead, Father had threatened to kill himself in front of her. According to Tara M., Father was a "controlling individual" and a "controlling husband." Tara M. testified that after the juvenile court case began, she and a friend called the authorities on Father. Father was

charged with assault against the friend. He later reached a plea deal. Tara M. said that Father often made threats with guns. Tara M. agreed that Petitioners had taken good care of Bentley. Asked about Bentley's injuries, Tara M. stated: "When I left Bentley, he was fine. He was alert. He was laughing. He was talking -- or cooing. I'm sorry. And he was perfectly fine when I handed him over to [Father]."

On cross-examination, Tara M. said that Father was a good dad when she met him. Asked if she thought that Father intentionally hurt Bentley, Tara M. said she did not know. Tara M. said she had never seen Father abuse either of the Children. Tara M. said that Father was a "fun parent," and the Children loved him.

Father testified next. Father was 30 years old. He had recently been diagnosed with leukemia. Father said that his leukemia was a treatable illness he can live with, but he will need to take chemo pills for the rest of his life. He has drowsiness and headaches. Father works full time, earning $25 per hour. Father has worked at his present job since August or September of 2023. In 2022 or 2023, at a previous job, Father earned around $85,000 per year. Father has three children, none of whom are in his care.

Turning to the June 13, 2020 incident with Bentley, Father said that this was the first time he had Bentley alone in his care. Father said this was because of his work schedule. Father testified to what happened:

> I'm unloading the supplies that I got from town, and then Dawson says he wants to get his pig, so we went down to my dad's house, caught his pig, went to bring it back up to the house, and Dawson leaves to go over to my mom's. Me, my dad, and Bentley are unloading the pig behind the house. And after we get that done, me and Bentley go inside.
> I put him on -- take him out of the car seat, put him on the couch, get ready to go make a bottle. And then that's when I heard a thump. Because he either rolled off the couch or maybe I didn't have him set up there good enough. So then I called -- I think I called my dad first. And then I think me and Bentley -- well, I ran with Bentley to my mom's, which was probably about -- I would guess about 400 feet from my house.

Asked whether he believed someone hurt Bentley, Father said he thought "something has happened" but he did not know what. He stated that many people had babysat Bentley, so he was not sure who did it. With respect to Tara M.'s claims about his past behavior with guns and domestic violence, Father said he never did these things. Father said that he no longer owns any guns. Father denied pulling a gun on anyone but acknowledged having threatened suicide with a gun. Asked if he has any concerns about Petitioners raising the Children, Father said: "My only concern is that they won't be able

to have me as part of their life if they get raised by [Petitioners]." Father acknowledged having chosen to defend himself in his criminal matter before pursuing custody of the Children.

Regarding child support, from September 5, 2022, through January 5, 2023, Father earned around $23 or $24 per hour, plus salary and overtime. For 2022, Father earned around $85,000. Father said he paid Petitioners $100 to $200 dollars per month during that timeframe. Presented with a child support worksheet showing that his obligation would have been $1,438 per month, Father acknowledged that he paid about 10% of what he should have been paying. Father was presented with another worksheet, this time for Dawson specifically, reflecting an obligation of $1,347. Father said there was no way he could have paid that amount. Pressed on this point, Father said he retained private counsel for his criminal matter. He also paid for a parenting class, specialists, and counseling. Father's father helped him pay his legal fees. Father later paid his father back.

On cross-examination, Father testified that he is "very willing" to take legal and physical custody of and financial responsibility for the Children. Father took several courses such as anger management, domestic class, one-on-one counseling, and marriage counseling. Father bought the Children clothes and toys. Father said that he had never intentionally harmed either of the Children. Father had also maintained the Children's health insurance, which was around $100 per weekly paycheck. In addition, Father paid a supervisor around $100 for visits. Father said he would be on probation for eight years. Father has a home and a steady income. Father said he visits the Children one to three times a month. Father denied having been alone with Bentley between June 3 and June 6, 2020, when Bentley's rib fractures most likely occurred. Asked how the termination of his parental rights would affect the Children, Father said: "I think it would be devastating for them." Dawson calls him "Daddy," and Bentley calls him "Daddy" or "Cory." Father said that Dawson, the older child, still understands him to be his father, whereas Bentley does not. Father said he attended the Children's T-ball games and parent-teacher conferences.

Trial resumed the next day, with Haley S. testifying. Haley S. is Lisa S.'s daughter and Dawson's mother. Haley S. witnessed Father have temper problems and make suicide attempts. On cross-examination, Haley S. said she did not think Father was a violent person. Asked if she believed Father hurt Bentley, Haley S. said: "I would like to say that he didn't, but after hearing the whole testimony yesterday, I'm not completely sure." She added: "I don't think it was an intentional thing, no. Maybe unintentional, yes."

Lisa S. testified next. Lisa S. said that she and her husband have sufficient financial means to take care of the Children. Lisa. S. said she had no hesitation in taking Bentley even though she is not related to him. Lisa S. described Bentley's condition when he was placed in her home: "When we brought Bentley home, he cried a lot. You know, he was

uncomfortable, kind of unsoothable, really. He had lost his -- what they called depth perception, which meant if you moved him fast, he would jerk because he was afraid he was being dropped." Bentley underwent occupational and physical therapy. Bentley has reached his milestones. Dawson calls Lisa S. "Nanny," and Richmond S. "Little Pa" or occasionally "Daddy." Bentley calls her "Mommy" and Richmond S. "Daddy."

Regarding child support, Lisa S. acknowledged having told Father that if he needed the money, to keep it, in view of Father's cancer diagnosis if he needed to pay for treatment. However, Lisa S. said that it would have helped her had Father paid what he was supposed to have paid under the child support worksheets. Lisa S. testified that changing the Children's caretaker and environment would have a detrimental effect on them. As for whether Father could visit the Children going forward should Petitioners adopt the Children, Lisa S. said: "That will depend completely upon the children and what their needs are. We will do what is best for the children."

On cross-examination, Lisa S. acknowledged positive things Father had done, like visiting regularly. She said he regularly bought the Children food, clothes, toys, gifts, and items of that sort. Asked if she believed Father posed a risk of physical harm to the Children, Lisa S. said: "I would like to think not, but I could not say with hundred percent absolute validity that he wouldn't." As to Bentley's injuries, she said: "I don't think he intentionally did it, but I can't speak for what someone does." Lisa S. acknowledged that Father had bought the Children three cows. Asked if she knew that Donnell said a subdural or subarachnoid hemorrhage can occur during a complicated birth, Lisa S. said yes. Lisa S. further acknowledged the evidence that Bentley's head trauma had not been dated; that retinal hemorrhages could occur at birth; that a subdural hemorrhage could be caused by a fall; that likewise a retinal hemorrhage could be caused by a fall; and that it is possible that a child might not show symptoms of some of Bentley's injuries. Lisa S. testified that she did not know that she needed to have a home study conducted since she is unrelated to Bentley.

Richmond S. testified as well. His testimony largely echoed that of his wife. William Webb ("Webb"), director and counselor at Manna House Ministries, testified next. Webb supervised several of Father's visits with the Children. Webb said Father was very attentive to the Children. Webb testified that the Children were excited to see Father. Webb had no concerns about the Children being around Father. Father's father, Paul S., testified next. Paul S. did not believe Father hurt Bentley. Tiffany W., Father's sister, testified also. She testified favorably about Father's parenting of the Children. Tiffany W. did not believe Father had hurt anyone.

In July 2024, the Trial Court entered an order terminating Father's parental rights to the Children. The Trial Court also terminated the parental rights of the Children's respective mothers. In its order, the Trial Court found that Petitioners had proven five grounds against Father by clear and convincing evidence: (1) failure to manifest an ability and willingness to assume custody, (2) abandonment by failure to support, (3) persistent conditions, (4) severe child abuse and (5) sentence of two or more years for conduct against a child. The Trial Court found further, also by clear and convincing evidence, that termination of Father's parental rights is in the Children's best interest. In its termination order, the Trial Court found, in relevant part:

23. Nurse Practitioner Carrie Donnell testified by deposition. She is a pediatric practitioner and a member of the CARE Team, she has a Master's Degree in nursing, she has been employed at Vanderbilt Medical Center since 2010 and has been licensed in the state of Tennessee since 2009. She has specialized training in pediatrics. She has lectured nationally. She is a member of several professional groups including the American Academy of Pediatrics. She has been qualified to testify as an expert in other courts. Her CV and deposition are Exhibit 1A.

24. Counsel for [Father] filed a Motion which was heard on the first day of this trial regarding whether Ms. Donnell should be qualified as an expert. After hearing that Motion, the Court found her qualified to testify as an expert. Further, the Court stated it would carefully read the deposition and give it the weight to which it was entitled.

25. Ms. Donnell observed the child (Bentley) on one (1) occasion on June 13, 2020 at Vanderbilt Children's Hospital. In her communications with [Tara M.], she learned that the child had been vomiting two (2) days prior to this incident and running a fever. The child was seen by Dr. Sewell or his staff. [Tara M.] related to Ms. Donnell that she left the child with the Father at approximately 9:00 a.m. for her first day back at work from maternity leave. At approximately 10:30 a.m. Father called Mother and said the child was fussy and requesting information about when the child last ate. At 10:58 a.m. Father called Mother. Father was crying and panicked. He had called 911. Mother immediately went home. An ambulance attendant had Bentley. When Mother arrived she said that the child's "eyes were looking to the left and not responding." She confirmed that the child was airlifted to the Vanderbilt.

26. Ms. Donnell stated that the child suffered an intracranial bleed based on the records from the neuroradiologist which included a CT and a brain MRI. A CT confirmed the child had rib fractures. The intracranial bleeding was "fairly extensive". The blood was on top of the brain between the skull and brain. It covered the whole top of his head. There was evidence of injury to

-7-

the veins. There were multiple hemorrhages in the right retina "too numerous to count and extended past the equator". There was no injury to the left eye. She confirmed that the intracranial bleeding and the retinal hemorrhage are two (2) separate injuries. She confirmed from the diagnostic records and other records that the child had a healing rib fracture, posterior rib fracture, and a classic [metaphyseal] fracture of the right distal femur and of the right proximal tibia. She described the fracture as a "bucket handle fracture". She opined these injuries could not have been caused by normal child care or swaddling. She also confirmed that these injuries were not caused by an uncomplicated child birth. The records reflected that there were no genetic markers to indicate brittle bones or any other type of condition. The date of the fractures cannot be ascertained with specificity. She did say that the rib fracture was at a different time than the intracranial brain bleed and retinal hemorrhage and brain injury. The retinal hemorrhage and intracranial bleeding and brain injury were acute since the child was "immediately symptomatic".

27. Regarding prognosis, Ms. Donnell testified that the long term effect of those injuries may not be ascertainable until the child is in school. She described the condition as "serious injury". She testified that these findings "would not have resulted from falling off a couch."

28. Ms. Donnell had talked with Mr. Sewell and confirmed that Mr. Sewell denied any previous concerns regarding abuse and neglect.

29. Ms. Donnell testified that a subdural hemorrhage could occur with a complicated delivery. However, [Tara M.] had reported that her birth was non-traumatic and without complications. The child was delivered by c-section. Ms. Donnell testified that if a subdural hemorrhage had occurred at birth, it would have resolved by 2 months of age. Further, regarding rib fractures, they would have typically resolved within six (6) weeks. She described that rib fractures require compression from both front and back, like squeezing the chest. She opined that it was not likely to have occurred at birth. Regarding the right femur fracture, Ms. Donnell opined this type of fracture requires "shearing force or really a pulling of a bone, pulling on the extremity. It's not something you get with a fall. They're really associated with abusive injury["] "because of the torsion required to cause that injury." She opined that retinal hemorrhage is highly concerning for non-accidental trauma.

30. She further opined that a child with multiple hemorrhages in multiple areas was non consistent with a low-level fall. She has seen this type of injury with forceful shaking. She also stated that shaking could cause rib and bucket handle fractures.

31. Her opinion within a reasonable degree of medical certainty was that the injuries suffered by Bentley were non-accidental.

32. The medical evidence of a healing rib and bone fractures had to have occurred while Bentley was in the care of one or both of his parents or another caregiver at times separate and apart from the acute injuries. Criminal charges were not brought against anyone except [Father].

\*\*\*

[Failure to manifest an ability and willingness to assume custody]

The Court does conclude that based on the facts hereinabove stated, that Petitioners have proven by clear and convincing evidence that he does not have the ability to assume legal custody. He is on probation for attempted child abuse on Bentley. He suffers with a serious medical condition. He does not express a willingness to assume legal and physical custody. The Appeal of the Juvenile Court decision has not been heard. Although he is financially able to support the children other issues prevented him from taking custody. As hereinafter set forth, this Court finds that he has committed severe abuse on Bentley. He does not have the current ability to assume legal and physical custody. The Court also concludes placing any child in the physical or legal custody would pose a risk of substantial harm to the physical or psychological welfare of the child. Petitioners have proven this statutory basis by clear and convincing evidence.

\*\*\*

[Abandonment by failure to support]

During the relevant four (4) month period of time [identified by the Trial Court as September 4, 2022 until January 4, 2023], [Father] paid by check two $100.00 payments. He says that he made other payments by cash. Petitioners acknowledged receiving some amount of cash. However, based on the facts hereinabove stated regarding his income during that period of time he had a clear ability to pay. Although he did have legal expenses, that did not justify his failure to contribute to the support of his children in a meaningful and appropriate manner. He chose to repay his father for a loan made for attorney fees rather than pay child support for his children. Therefore, the Court concludes that his failure to support the children has been proven by clear and convincing evidence and justifies termination of his parental rights.

***

[Persistent conditions]

The ground has been proven by clear and convincing evidence in that he has been found by this Court to have committed severe abuse on Bentley, and those conditions persist. The medical proof confirms that the child was injured by non-accidental means. The child was in the sole care of [Father] at the time of the injuries. He continues to deny doing anything to injure the child. There is nothing to insure that a child would not be subject to further abuse and/or neglect in his care. Therefore, the Court concludes that Petitioners have proven by clear and convincing evidence that termination of his parental rights is appropriate. As hereinabove stated, the child has been in the care of Petitioners for over 3 years. Theirs is the only home known by Bentley. Dawson has always been comfortable and safe in their home.

***

[Severe child abuse]

Based on the facts hereinabove stated, it is the opinion of the Court that [Father] inflicted injury on Bentley [S.] that constituted severe child abuse pursuant to T.C.A. §37-1-102(27). He inflicted serious bodily injury in accordance with T.C.A. §39-15-402(c). He is the only person who knows and has actual knowledge of the facts and circumstances which led to Bentley's acute injuries. The medical proof is that the child's acute injuries were non-accidental. Therefore, the Court concludes that Petitioners have proven by clear and convincing evidence that the parental rights of [Father] should be terminated on this ground as to both children in accordance with T.C.A. §36-1-113(g)(4).

***

[Sentence of two or more years for conduct against a child]

Petitioners seek termination of parental rights of [Father] pursuant to T.C.A. §36-1-113(g)(5). He has been sentenced to more than two (2) years imprisonment for conduct against a child that has been found by this Court to be severe child abuse. Thus, this ground has been proven by clear and convincing evidence as to [Father].

-10-

***

[Best interest]

A. Termination of the parental rights of all (3) parents involved in this matter will insure stability and continuity if placement throughout the children's minority. They will remain in the home of the Petitioners where they have resided since approximately June 13, 2020. That is the only home that Bentley [S.] knows. Dawson has lived in this stable and secure environment since he was approximately 3 years of age and at prior regular intervals.

B. The Petitioners have been caretakers for Dawson and Bentley since June 13, 2020. They have provided the children with a very safe and appropriate physical environment. They have provided for all of the children's emotional, psychological, and medical needs. Change in the children's caretakers at this point would likely adversely effect the children's emotional, psychological, and other conditions.

C. None of the parents have demonstrated continuity and stability in meeting the children's basic material, educational, housing, or safety needs. Although [Tara M.] and [Father] have made token support contributions, none of the parents have made meaningful contributions to the children's support. All of the children's basic needs have been provided by Petitioners.

D. It does appear that [Tara M.] has a parental relationship with Bentley. It does appear that [Father] has a parental relationship with Dawson and Bentley. [Haley S.] has no parental relationship with Dawson. However, the secure and healthy parental attachment is with Petitioners. [Tara M.] and [Father] have visited with the children and enjoyed playtime. Based on the photos in Exhibit 5, it is clear that [Father] and both children enjoy seeing one another. Additionally, it is clear from the photographic evidence in Exhibit 31 that [Tara M.] and Bentley enjoying [sic] spending time with one another. [Haley S.] has no relationship with Dawson. The visits have always been under supervision. The Court cannot conclude that the parental relationships are secure and healthy.

E. Both [Tara M.] and [Father] have maintained regular visitation and contact with their children. Both appear to have a positive relationship with their respective children. However, the Court cannot conclude they have appropriate parental relationships.

F. There is no evidence before this Court to determine whether the child or children will be fearful of living in either parents' home. This factor is inapplicable.

-11-

G. There is no proof before this Court to determine whether being in the parent's home would trigger or exacerbate the child's experience of trauma. This factor is inapplicable.

H. Dawson and Bentley have created healthy parental attachments with Petitioners.

I. The children, Dawson and Bentley, are half-siblings. They have a very strong emotional and significant relationship with each other. Neither child knows, Parker, their sibling/half-sibling. Petitioners are very knowledgeable regarding the children's respective heritage. The effect of potentially separating Bentley and Dawson would negatively impact these children. Petitioners testified that contact with the parents would continue if in the best interests of the children.

J. As to [Tara M.], it appears that she has improved her circumstances, conduct and environment. However, there is grave concern that she will reconcile with [Father]. Thus, there are concerns that her improved circumstances may not be lasting. Based on the injuries sustained by Bentley, this Court cannot say it will ever be safe for any child to be in their home.

K. [Father] and [Tara M.] have taken advantage of some available programs, services, and community resources to assist them recommended by DCS and/or probation. [Father] has successfully completed many classes, mostly to satisfy his probation requirements.

L. Regarding [Tara M.] and [Father], no Permanency Plan was introduced in this trial so this Court cannot state any findings concerning any of the children.

M. [Father] has not filed a Petition to seek return of custody. [Tara M.] has sought a return of custody of her daughter Parker. She has not filed pleadings seeking the return of Bentley. [Tara M.] has made improvements in her circumstances. However, if [Tara M.] and [Father] reconcile, the child/children would be in an unsafe environment.

N. Based on the proof in this case, [Father] has shown physical abuse toward Bentley and Tara has failed to protect the child.

O. From the proof, [Father] has provided safe and stable care for Dawson prior to the June 13, 2020 incident. Bentley was generally in the care of Tara and [Father] until the acute injury date.

P. It appears that [Tara M.] and [Father] have an understanding of the needs of the children. However, they have acquiesced in all those basic and specific needs being provided by Petitioners for at least three years.

Q. Based on the June 13, 2020 incident, the Court concluded that [Father] cannot provide a healthy and safe environment for a child. Based on the child's healing fractures, and failure to protect the child the Court cannot

-12-

conclude that [Tara M.] can provide a safe home in which the child could thrive.

R. Up until the filing of the Petition for Termination of Parental Rights, neither parent provided anything but token support for the children. Subsequent to the filing of the Petition, [Tara M.] has paid monthly support of Bentley per her testimony. A child support action is pending as to [Father]. That Order was not admitted into evidence.

S. The Court has concerns regarding the mental and emotional fitness of [Father] to significantly provide safe and stable care and supervision of the children. This is based on the June 13, 2020 incident and his previous domestic violence issues. [Tara M.] appears to be able to appropriately provide a house and support for the children. However, the Court cannot conclude she can provide a safe environment for the child.

***

3. The Guardian Ad Litem's position was that termination of all three (3) parent's parental rights was in the best interest of Bentley and Dawson.

4. In balancing the factors hereinabove stated, the Court concludes by clear and convincing evidence that termination of parental rights of [Father], [Tara M.], and [Haley S.] is in the best interest of [the Children].

5. The putative father registry responses must be filed with the Court Clerk.

6. Due to the unique circumstances in this case, the Court waives the necessity of a home study of Petitioners' home regarding Bentley.

Father timely appealed to this Court.

## Discussion

Father raises several issues on appeal, which we restate, consolidate, and reorder as follows: 1) whether the Trial Court erred in admitting Donnell's expert testimony; 2) whether the Trial Court erred in finding the ground of severe child abuse; 3) whether the Trial Court erred in finding the ground of a sentence of two or more years for conduct against a child; 4) whether the Trial Court erred in finding the ground of failure to manifest an ability and willingness to assume custody; 5) whether the Trial Court erred in finding the ground of persistent conditions; 6) whether the Trial Court erred in finding the ground of abandonment by failure to support; 7) whether the Trial Court erred in finding that termination of Father's parental rights is in the Children's best interest; and 8) whether the Trial Court erred in waiving a home study regarding Bentley in Petitioners' home.

-13-

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[6] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

---

[6] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[7] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[8] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial

---

[7] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

[8] Tenn. Code Ann. § 36-1-113(i).

court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id.* If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id.* Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id.* (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### *B. Standards of Appellate Review*

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own

determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

On January 5, 2023, when Petitioners filed their petition, the relevant grounds read as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

\*\*\*

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

(4) The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child;

(5) The parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against a child that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102. Unless otherwise stated, for purposes of this subdivision (g)(5), "sentenced" shall not be construed to mean that the parent or guardian must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of more than two (2) years upon the parent or guardian; [and]

***

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g) (West July 1, 2022 to May 4, 2023).

The relevant abandonment ground at issue, abandonment by failure to support, was defined as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

-18-

\*\*\*

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;

\*\*\*

(D) For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's support" means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period;

\*\*\*

(F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child;

\*\*\*

(H) Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children;
(I) For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102 (West July 1, 2022 to May 4, 2023).

Witness credibility is also implicated in this case. We defer to a trial court's credibility determination absent clear and convincing evidence to the contrary. *Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014). We extend deference to trial courts' credibility determinations whether they are made explicitly or implicitly. *Kautz v.*

*Berberich*, No. E2019-00796-COA-R3-CV, 2021 WL 1034987, at *7 (Tenn. Ct. App. Mar. 18, 2021), *no appl. perm. appeal filed*.

The first issue we address is whether the Trial Court erred in admitting Donnell's expert testimony. This Court has explained:

> A trial court's decision to exclude an expert is reviewed for an abuse of discretion. *Boyd v. BNSF Ry. Co.*, 596 S.W.3d 712, 724 (Tenn. Ct. App. 2018). "Generally, questions pertaining to the qualifications, admissibility, relevancy, and competency of expert testimony are matters left to the trial court's discretion. We may not overturn the trial court's ruling admitting or excluding expert testimony unless the trial court abused its discretion." *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005) (internal citations omitted). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Fisher v. Hargett*, 604 S.W.3d 381, 395 (Tenn. 2020) (quoting *Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 305-06 (Tenn. 2020)).

*Jackson v. Thibault*, No. E2021-00988-COA-R3-CV, 2022 WL 14162828, at *3 (Tenn. Ct. App. Oct. 25, 2022), *no appl. perm. appeal filed*.

Father argues that the Trial Court abused its discretion. He argues, to wit: Donnell does not know what confirmation bias, expectation bias, or motivated reasoning are; that she mispresented she was qualified as an expert on her CV when she was not qualified by the court; that she had no formal training in over a year by the time of her testimony; that she does not have a Bachelor of Science; that she is neither a doctor, board-certified in child abuse pediatrics, a radiologist, an ophthalmologist, nor does she have any certification in child abuse issues; and that she does not know the error rate for the type of science she used. In response, Petitioners assert that Donnell did not misrepresent her CV, and that a ruling on her expert status was merely reserved in a previous case. They point out further that Donnell agreed that doctors know they are wrong when they are presented with contrary evidence. In addition, Petitioners point out that Donnell has been qualified as an expert before, citing this Court in a 2013 case:

> After reviewing the record, we hold that the trial court did not err in qualifying Ms. Donnell as an expert witness in child abuse. Ms. Donnell earned a master's degree in nursing from Vanderbilt University and is a pediatric nurse practitioner at Vanderbilt Hospital. She works under the supervision of a child abuse pediatric specialist and is on the CARE Team,

which reviews approximately 500 child abuse or neglect cases per year. Ms. Donnell had specialized knowledge in the area of child abuse that substantially assisted the court in determining a fact in issue. *See* Tenn. R. Evid. 702. In addition, we have reviewed Ms. Donnell's testimony related to Noah's medical condition and find she was competent to testify regarding his medical condition and treatment.

*In re Adriana L.*, No. M2013-00646-COA-R3-PT, 2013 WL 5434629, at *4 (Tenn. Ct. App. Sept. 25, 2013), *perm. app. denied Dec. 23, 2013.*

Under these circumstances, we find that in admitting Donnell's expert testimony, the Trial Court neither applied an incorrect legal standard, reached an illogical or unreasonable decision, nor based its decision on a clearly erroneous assessment of the evidence. Donnell's lack of knowledge about confirmation bias, expectation bias, and motivated reasoning, as well as the other points Father raises against Donnell's testimony, go to the weight of her testimony rather than its admissibility. We find no abuse of discretion in the Trial Court's decision to admit Donnell's expert testimony.

We next address whether the Trial Court erred in finding the ground of severe child abuse. Although this is not the first ground Father chose to address, we address it first as it impacts several other grounds. The Trial Court found, in part: "[I]t is the opinion of the Court that [Father] inflicted injury on Bentley [S.] that constituted severe child abuse pursuant to T.C.A. §37-1-102(27). He inflicted serious bodily injury in accordance with T.C.A. §39-15-402(c). He is the only person who knows and has actual knowledge of the facts and circumstances which led to Bentley's acute injuries. The medical proof is that the child's acute injuries were non-accidental." In finding the ground of severe child abuse, the Trial Court did not rely upon the juvenile court's order (which is still on appeal) nor did it rely upon Father's conviction for attempted aggravated child abuse. Instead, the Trial Court independently concluded by clear and convincing evidence that Father committed severe child abuse.

Father argues that there is serious and substantial doubt he caused Bentley's injuries. Father says he pled guilty to attempted aggravated child abuse because it was in his best interest to do so. Father points to testimony from various parties below, including Petitioners, to the effect that they did not believe he would harm the Children. Regarding the medical proof, Father asserts there are several weaknesses: that Donnell could not identify dates or a timeframe for the metaphyseal fracture of the right distal femur, proximal tibia, subarachnoid hemorrhage, subdural hemorrhage, or retinal hemorrhages; that while at the emergency room, Tara M. mentioned being self-conscious of shaken baby syndrome; that Tara M. was not a credible witness and the Trial Court explicitly found as such; that with respect to the rib fracture, Father was not alone with Bentley from June 3,

2020, to June 6, 2020, the timeframe Donnell identified as when this particular injury occurred; that Bentley was fussy and vomiting in the days before June 13, 2020; that Bentley had been alone with numerous people in the two weeks leading up to June 13, 2020; that Bentley's injuries may not have been identifiable by merely looking at him; that the retinal hemorrhages, subarachnoid hemorrhages, subdural hemorrhages, and the leg fracture could all have been caused by a fall; and that Father has denied knowing what happened to Bentley.

While Father has pointed out what he regards as weaknesses in Donnell's testimony, he has produced no expert to rebut Donnell. At her deposition for proof, Donnell testified, in part:

Q. Is it more -- is it easier for tiny children to have breaks or is it more difficult for babies this size to have broken bones?
A. It's difficult. One, they can't create their own momentum to typically cause their own fractures, and the bone structure allows for a lot of flexibility prior to break of the bone. You think about a child who goes through the birth canal. It's a very tight squeeze, and so there's -- the body, the baby's body, allows for a lot of deformity before fracture.
Q. So a child this age, their bones have some give to them; would that be accurate?
A. Uh-huh. Yeah. They're fairly flexible.
Q. Could these injuries have been caused by normal childcare?
A. No.
Q. Could these injuries have been caused by swaddling?
A. No.
Q. Could these injuries have been caused by childbirth?
A. No. Not an uncomplicated childbirth.
Q. Were other explanations for these injuries ruled out, like genetic disorders or blood disorders, any of that?
A. Yes. There was testing that was sent both for looking -- for evaluating the bone health, as well as laboratory evidence, labs sent to evaluate for the health of the blood, and all of that was overwhelmingly negative.
Q. So no genetic markers that would indicate brittle bones or a blood disease or anything like that?
A. No.
Q. Were there follow-up scans at Vanderbilt regarding these fractures?
A. Yes.
Q. And what did they show?
A. They further confirmed the known fractures. There was a concern about the view on one. There was concern about the distal tibia. And that -- so

that's the reason we get the repeat imaging, to assess interval healing. And that one appeared the same as it had in the previous study, so that was not evidence of fracture, but the studies did show interval healing of the rib fracture and the classic metaphyseal lesions, or fractures, on the right side.

Q. So there was actually another fracture that couldn't be confirmed outside of these three?

A. It was a concerning finding. We never -- we did not confirm that it was a fracture, because the appearance was similar on the first and second scans or skeletal surveys, and so that potentially just could have been projectional or a normal variant for the child. So that was ruled out as a fracture.

Q. So let's go back to the rib fracture. You said that was a healing fracture. Does that mean that the rib fracture happened at a different time than the other two fractures in the leg?

A. Well, we can't date classic metaphyseal lesions. They don't heal in the same fashion as a long bone fracture or like a rib fracture, where we see evidence of healing over the course of time. And so we know that it's healing, the rib fracture, because there was evidence of a callus formation on the bone, a bulbous callus formation. But the classic metaphyseal lesions don't show the same signs of healing, other than you will see them resolved over time, but they don't show what's called periosteal reaction. So all that to say is that we can't date those fractures, so I couldn't say within a reasonable degree of medical certainty that those -- all the fractures happened at the same or different times.

Q. What about the head injury? Can you say that the rib fracture happened at a different time than the intracranial bleeding and the retinal hemorrhages and the brain injury?

A. Yes.

Q. So definitely those were two different times of injury?

A. Yes.

Q. Is there any way to date the intracranial bleeding, the retinal hemorrhages, and the brain injury?

A. Just that it would be acute or newer. We can't date with any real certainty, but the fact that he was completely normal, by history, and then abnormal would indicate that the event happened at that time. When we see a brain injury or an intracranial injury like that occur, the child becomes immediately symptomatic.

Q. So the symptoms that were described by the mother, including his eyes being strange and him being limp, would those have been symptoms of the brain injury and the intracranial bleeding?

A. Yes.

Q. So if he had already had those injuries when Mother left that morning, she would not have described him as a normal -- in his normal, happy state?
A. Right.
Q. Tell me about the prognosis for a baby of this age with this type of brain injury.
A. Well, when a child has -- a young child has a brain injury, there are risks associated with their long-term development, their neurocognitive development, their physical development. There are risks of it affecting their vision long term. And so it was important for this child to follow closely with ophthalmology and developmental medicine and early intervention services. But oftentimes we don't see the long-term effects until these children enter school age, when they start trying to -- more accessing those higher level of functioning and using, you know, complex reasoning and things like that in school.
Q. So is this a serious injury to a child of this age, to have this brain injury?
A. Yes.
Q. Could it have resulted in death?
A. It's possible.

***

Q. Would you be able to say within a reasonable degree of medical certainty that these injuries could have occurred from a fall -- from a child rolling off a couch?
A. This constellation of findings would not have resulted from falling off a couch.
Q. Would you have expected a more traumatic cause for injuries this severe?
A. Yes.
Q. In your expert opinion, would it concern you for this child to be returned to the same caretakers that were in charge when this child received these injuries?
A. Yes.
Q. Will this child have to be monitored closely throughout his childhood due to the seriousness of these injuries?
A. Yes.

From the unrebutted medical proof, Bentley's injuries had a more traumatic cause than falling from a couch. Bentley's brain-related injuries would have been immediately symptomatic. Indeed, Bentley was airlifted to Vanderbilt Hospital. Thus, while in Father's solo care, Bentley received traumatic head injuries which were non-accidental in nature. Father's arguments fail to address these essential facts. The fact that there was no

-24-

eyewitness besides Father to testify to what happened to Bentley on June 13, 2020, does not mean that what happened to Bentley is fundamentally unknowable or that we are wholly dependent on Father's account. Donnell's expert testimony is clear—Bentley received a traumatic, non-accidental head injury while in Father's solo care, and there is no one else besides Father to identify as the perpetrator. Father's pointing to other people who had Bentley at other times is sheer speculation; Bentley did not become immediately symptomatic in their care or get airlifted to the hospital with a traumatic brain injury. Like the Trial Court, we are unmoved by testimony from witnesses at trial who said that they could not believe Father would inflict these injuries on Bentley. The medical proof and its logical consequences are that he did. The witnesses' personal incredulity that Father could ever do such a thing does not undermine the unrebutted medical evidence. With respect to Father's denials, the Trial Court implicitly found his testimony not to be credible. There is no clear and convincing evidence that would overturn the Trial Court's implicit credibility determination against Father. The evidence does not preponderate against the Trial Court's findings relative to this ground. We find, as did the Trial Court, that the ground of severe child abuse was proven against Father by clear and convincing evidence.

We next address whether the Trial Court erred in finding the ground of a sentence of two or more years for conduct against a child. The statutory ground at issue provides as relevant: "The parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against a child that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102." Tenn. Code Ann. § 36-1-113(g)(5) (West July 1, 2022 to May 4, 2023). The Trial Court found: "[Father] has been sentenced to more than two (2) years imprisonment for conduct against a child that has been found by this Court to be severe child abuse." Father pled guilty to and received an eight-year sentence for attempted aggravated child abuse. Father argues on appeal that "[a]n attempt is not conduct against a child." Father cites a dispositional order by the Tennessee Supreme Court in *In re Treylynn T.*, No. W2019-01585-SC-R11-JV (Tenn. Dec. 16, 2020) for the proposition that, by definition, "attempted" aggravated child abuse is not severe abuse. *In re Treylynn T.* was a dependency and neglect matter in which the Supreme Court reversed a finding that the mother committed severe child abuse. In its case dispositional order in *In re Treylynn T.*, the Tennessee Supreme Court acknowledged a concession by DCS that attempted aggravated child abuse "is not one of the offenses enumerated in the statutory definition of severe child abuse, Tenn. Code Ann. § 37-1-102(b)(27)(C)[.]"

Father's reliance on *In re Treylynn T.* is misplaced. The Trial Court independently concluded that Father severely abused Bentley. For that determination, the Trial Court did not rely upon the criminal court decision at all except as to the sentence of more than two years for his conduct. That the crime Father pled guilty to—attempted aggravated child abuse—does not meet the statutory definition of severe child abuse is correct but beside

-25-

the point. Father was sentenced to over two years based on the same underlying conduct that the Trial Court independently found was severe child abuse. We also note the clear and convincing standard applied by the Trial Court, as distinct from the beyond a reasonable doubt standard necessary to convict in criminal court. In addition, Father's argument that an attempt to abuse a child is not conduct against that child for purposes of ground (g)(5) is unreasonable. A failed attempt to abuse a child is conduct against that child despite the failure. We find, as did the Trial Court, that the ground of a sentence of two or more years for conduct against a child was proven against Father by clear and convincing evidence.

Continuing our review of Father's issues, we next address whether the Trial Court erred in finding the ground of failure to manifest an ability and willingness to assume custody. This ground consists of two prongs. Regarding the first prong of our analysis, our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). The second prong of the statute requires the court to consider whether placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *See* Tenn. Code Ann. § 36-1-113(g)(14). With respect to ability, Father points to his taking classes, maintaining a home and transportation, holding a job, regularly visiting, and providing support. He also says there is no proof that the Children face any risk in his home. Regarding willingness, Father notes his close contact with the Children and his efforts in this case.

Under *In re Neveah M.*, failure to manifest either the ability or the willingness to assume custody satisfies the first prong of this ground. The Trial Court found that Father failed to manifest an ability or willingness to assume custody of the Children, stating as pertinent:

> He is on probation for attempted child abuse on Bentley. He suffers with a serious medical condition. He does not express a willingness to assume legal and physical custody. The Appeal of the Juvenile Court decision has not been heard. Although he is financially able to support the children other issues prevented him from taking custody. As hereinafter set forth, this Court finds that he has committed severe abuse on Bentley. He does not have the current ability to assume legal and physical custody.

The evidence does not preponderate against these findings. One of the most relevant considerations is Father's refusal to acknowledge what he did to Bentley. Despite Father's positive actions, like taking classes and visiting, his ongoing denial about Bentley's

incident means there is no prospect Father could be safely entrusted with the Children. We find, as did the Trial Court, that Father lacks the ability to assume custody of the Children. With respect to willingness, Father has remained in contact with the Children and has participated actively in this case. However, as Petitioners point out, he has not moved swiftly to petition for custody of the Children, instead focusing on resolving his criminal case. Meanwhile, around four years passed from removal through the termination trial. In this regard, Father displayed a lack of willingness to assume custody.

Regarding the second prong, whether placing the Children in Father's physical or legal custody would pose a risk of substantial harm to the physical or psychological welfare to the Children, Father argues that the Trial Court only repeated the statutory language and failed to make adequate findings. However, it is abundantly clear from the Trial Court's order that the basis for its finding on a risk of substantial harm stems from the horrific non-accidental injuries Bentley sustained in Father's solo care. Father failed to account for these injuries. In view of Father's continued denial, the Children are at risk of substantial harm should they be returned to Father's custody. Both prongs of this ground were proven by clear and convincing evidence. We find, as did the Trial Court, that the ground of failure to manifest an ability and willingness to assume custody was proven against Father by clear and convincing evidence.

We next address whether the Trial Court erred in finding the ground of persistent conditions. The Children had been removed from Father's custody as part of a dependency and neglect proceeding for at least six months. According to Father, Petitioners have failed to show that any harmful conditions necessitating removal still existed by trial. First, with respect to conditions still existing that likely would cause further abuse and neglect, the original condition necessitating removal was the incident in which Bentley sustained horrific non-accidental injuries. Father has never acknowledged that he inflicted the injuries. Therefore, in view of Father's denial, conditions still exist which likely would cause further abuse and neglect. In addition, Father's denial persisted over the course of nearly four years from his infliction of injuries on Bentley through trial. There is little likelihood that the conditions will be remedied at an early date so that the Children can be returned to Father's custody. Finally, given that the Children are in a safe, stable home, yet remain in legal limbo, the continuation of the parent/child relationship greatly reduces the Children's integration into a safe, stable, and permanent home. We find, as did the Trial Court, that the ground of persistent conditions was proven against Father by clear and convincing evidence.

We next address whether the Trial Court erred in finding the ground of abandonment by failure to support. The relevant timeframe for this ground is September 5, 2022, through January 4, 2023, the day before the petition was filed. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014), *no appl.*

*perm. appeal filed* ("[T]he applicable four month window for determining whether child support has been paid in the context of . . . failure to support includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed.").[9]  Father states that he regularly paid child support and provided the Children with various gifts over the custodial period.  Father also points to his testimony stating that he lived check to check during the relevant timeframe.  Continuing his argument, Father says he maintained the Children's health insurance, and that Petitioners never told him they needed more.

Father provided some child support during the four-month period at issue.  The question is whether that support was token in nature under the facts of this case.  As relevant, the Trial Court found:

> During the relevant four (4) month period of time, [Father] paid by check two $100.00 payments. He says that he made other payments by cash. Petitioners acknowledged receiving some amount of cash.  However, based on the facts hereinabove stated regarding his income during that period of time he had a clear ability to pay.  Although he did have legal expenses, that did not justify his failure to contribute to the support of his children in a meaningful and appropriate manner.  He chose to repay his father for a loan made for attorney fees rather than pay child support for his children.

The evidence does not preponderate against these findings by the Trial Court.  In light of Father's work history and pay, including his earning around $85,000 in 2022, Father's child support in the relevant period was token in nature.  The Trial Court clearly did not credit Father's excuses for failing to pay more.  Father did not prove by a preponderance of the evidence that his failure to provide more than token support was not willful.  We therefore find, as did the Trial Court, that the ground of abandonment by failure to support was proven against Father by clear and convincing evidence.

Having addressed grounds, we next address whether the Trial Court erred in finding that termination of Father's parental rights is in the Children's best interest.  On January 5, 2023, when Petitioners filed their petition, the statutory best interest factors read as follows:

> (i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court.  Those factors may include, but are not limited to, the following:

---

[9] The Trial Court incorrectly stated the timeframe as September 4, 2022, through January 4, 2023.  However, the error is immaterial under the facts of this case.

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West July 1, 2022 to May 4, 2023). Our Supreme Court has stated that, in a best interest analysis in a parental rights termination proceeding, "the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case." *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

Father raises numerous arguments as to why be believes the Trial Court erred in its best interest analysis, to wit: that terminating Father's parental rights will disrupt the Children's need for stability because he has been a regular presence in their lives; that returning Dawson to Father would be positive for Dawson as the latter has had behavioral issues due to being separated from Father; that Father has a stable home; that Father has a secure and healthy attachment with both of the Children; that Father has maintained regular visitation; that there is no evidence the Children are fearful of living with Father; that there is no evidence that Father triggers post-traumatic symptoms with the Children; that

Dawson still regards Father as his dad; that the Children have emotionally significant relationships with Father's side of the family; that Father has complied with services and several witnesses testified they do not believe he is a danger to the Children; that Father took advantage of all programs available to him; that Father moved swiftly to adjust his circumstances; that there is serious and substantial doubt that Father inflicted Bentley's injuries; that Father provided safe and stable care for Dawson for three years before removal; that Father has attended to the Children's needs; that Father has maintained employment; and that there is no evidence Father lacks the mental or emotional fitness to parent the Children.

Like the Trial Court, we credit Father for those positive steps he took over the course of the custodial episode. For instance, Father maintained a relationship with the Children despite their removal from his custody. He visited regularly when he was able. It also is clear that Dawson in particular still retains a view of Father as his dad. Nevertheless, for nearly four years from removal through trial, the Children lived in Petitioners' home. Petitioners looked after their care and are their primary caregivers. The Children also have a strong connection to Petitioners. That the Children, especially Dawson, retain a tie to Father does not mean that the Children lack one with Petitioners. Indeed, the Trial Court found that the Children have a healthy parental attachment to Petitioners, and the evidence does not preponderate against that finding. The Trial Court noted Petitioners' testimony that, should Father's parental rights be terminated, they would allow Father to have contact with the Children if they deem it in the Children's best interest. Father also touts his having provided the Children with support over the custodial episode. However, as found by the Trial Court, Father's contributions were token in light of his means. The Trial Court did not credit Father's excuses for his failure to provide more than token support, and we defer to the Trial Court's implicit credibility determination.

The weightiest consideration in this case concerns Father's severe abuse of Bentley. Father has consistently denied knowing what happened to Bentley. All the same, the unrebutted medical evidence is that Bentley received horrific non-accidental injuries while in Father's solo care. The fact that Father has never acknowledged his responsibility for Bentley's injuries is a major barrier to his reunification with the Children. Given Father's inability to acknowledge what he did to Bentley, there is a significant danger to the Children moving forward that additional abuse may be inflicted. That Father has maintained an active relationship with the Children is a very good thing and weighs against termination of his parental rights. It does not, however, outweigh the risk posed by Father's denial of his abusive actions, and the possibility of further abuse.

In the meantime, Petitioners provide for the Children's needs in a stable home. As found by the Trial Court, "[t]hat is the only home that Bentley [S.] knows. Dawson has lived in this stable and secure environment since he was approximately 3 years of age and

at prior regular intervals." The evidence does not preponderate against the Trial Court's findings relative to the Children's best interest. We find by clear and convincing evidence, as did the Trial Court, that termination of Father's parental rights is in the Children's best interest.

The final issue we address is whether the Trial Court erred in waiving a home study regarding Bentley in Petitioners' home. Tenn. Code Ann. § 36-1-116 provides, in part:

> (a)(1) Prior to filing a petition for the adoption of a child, the prospective adoptive parents shall, except as otherwise provided by law, contact a licensed child-placing agency, or a licensed clinical social worker, or if indigent under federal poverty guidelines, they shall, except as otherwise provided by law, contact the department, and request a home study or a preliminary home study concerning the suitability of their home and themselves as adoptive parents; provided, that the court may waive this requirement when the child is to be adopted by related persons.

Tenn. Code Ann. § 36-1-116 (a)(1) (West July 1, 2019 to May 4, 2023).

Petitioners are maternal grandmother and step-grandfather to Dawson. On the other hand, Petitioners are unrelated to Bentley. In its termination order, the Trial Court waived the need for a home study, citing "the unique circumstances" of this case. Petitioners argue on appeal that the Trial Court acted within its discretion. However, the statute is clear. If a child is to be adopted by related persons, the court may waive a home study. If a child is unrelated to prospective adoptive parents, as Bentley is here, the court lacks discretion to waive a home study. When a statute is unambiguous, we must give effect to its plain meaning. *See Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009). The statute at issue says: "[T]he court may waive this requirement <u>when the child is to be adopted by related persons</u>." Tenn. Code Ann. § 36-1-116 (a)(1) (West July 1, 2019 to May 4, 2023) (emphasis added). It does not stop at "the court may waive this requirement[.]" We decline to read into Tenn. Code Ann. § 36-1-116 the flexibility for courts to waive a home study for unrelated adoptive parents based on "unique circumstances" when the statute does not permit that. Therefore, we find that the Trial Court erred in waiving a home study as to Bentley, and we vacate the Trial Court's judgment to that end. We remand to the Trial Court for a home study to be conducted regarding Bentley in Petitioners' home. As we affirm the termination of Father's parental rights, he lacks standing on remand to challenge the Children's adoption moving forward.

## **Conclusion**

We vacate the Trial Court's waiver of a home study and remand for a home study to be conducted regarding Bentley in Petitioners' home. Otherwise, we affirm the judgment of the Trial Court, resulting in affirmance of the termination of Father's parental rights to the Children. This cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Cory S., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-33-